The next case, number 24-1690, local 8027, AFT-New Hampshire, AFL-CIO et al. v. Frank Edelblut et al. At this time, would counsel for the appellants please introduce herself on the record. She has 15 minutes. May it please the Court, my name is Mary Trick and I'm here on behalf of the State Defendants. I'd like to reserve two minutes for rebuttal. You may have two minutes. This case has a number of moving parts, but the path to resolution is fairly straightforward. To resolve this case, like all cases, the Court starts by asking what the applicable legal standard is. And to find the appropriate legal standard here, the Court needs to know two things. First, that the plaintiffs bring a pre-enforcement facial vagueness challenge. And second, that the statutes being challenged here are subject to a reasonable interpretation, which does not implicate the First Amendment. Once we know those things, then Hoffman Estates and Friese v. Formella tell us that the legal standard requires the plaintiffs to prove the statutes are vague in all their applications to succeed. The plaintiffs have not made that challenge, and therefore their claim fails. This morning, I'd like to walk through each of the steps in that analysis, and then save some time at the end to talk about severability. Vagueness is a constitutional concept to find its origins in the Due Process Clause. So much of the case law surrounding vagueness arises from situations where individuals come before the Court having had a statute enforced against them, saying that their due process rights were violated, that they didn't have fair notice, that the statute would apply to their actions. This case is different from that, because there is no as-applied challenge, nor could there be an as-applied challenge, as the state has taken no enforcement action against any individual at this time under either of the statutory provisions. That makes this a pre-enforcement facial vagueness challenge, and it challenges two statutory provisions under New Hampshire law, RSA 193.40 and RSA 354a, 31 and 32, perhaps 33. The standard to be applied to such a pre-enforcement facial challenge depends upon whether or not the statutes implicate the First Amendment. As the Supreme Court wrote in Hoffman Estates, the question is whether the statutory language reaches a substantial amount of constitutionally protected conduct. The statutory schemes here, both of them, when properly interpreted, do not implicate a substantial amount of First Amendment protected speech. The plaintiffs assert otherwise by pointing out that the statutes cover at least some extracurricular speech of teachers. While that's not factually incorrect, it asks the wrong question. The Supreme Court in Garcetti made clear that when we have a public employee and we're asking if the First Amendment protects their speech, the question is about whether or not the speech is made pursuant to an official duty or made by the employee as a citizen on a matter of public concern. So we have to ask what teachers' official duties are. Teachers, public school teachers, are employed by the state to impart knowledge on our students. Much of this imparting of knowledge is done inside the classroom through curricular activity, but some of it is also done outside the classroom through extracurricular activity. Whether we label speech curricular, extracurricular, co-curricular, isn't the constitutionally relevant question. The question is whether the teacher is speaking pursuant to their official duties. And when teachers are teaching, they're acting pursuant to their official duties. So how about a coach speaking to the teammates? I think that if you look at the Supreme Court precedent about what is covered, that it's going to depend upon the circumstances and whether the coach, when speaking to their players, are teaching themselves. What if I'm a really interested student in general and I read the news and I read about a Supreme Court case, let's say about affirmative action, that I found was really interesting to me? That's not what we're doing in class, but this is my social studies teacher. It appears to me they know a lot of stuff, and I'm interested in this. And after school, but they're there, I go talk to them. Is that covered teaching, or is that something else? Well, I think it wouldn't be covered by the amendment, whether it's teaching or not, because discussing the existence of these concepts in the world is not covered by the statute. What's covered by the statute is teaching students that they're right or wrong. Okay, but that conversation goes along, and the end of it, between student and teacher interacting, is teachers saying affirmative action is a good idea? I think that that would be a really close case, and I think we would disagree on whether or not that would cover it. But I guess this gets to the First Amendment problem, right? Assume for my discussion that's covered. Maybe it's not. Just assume it is. Is that a First Amendment-protected activity, because the teacher didn't ask for this conversation, but this is my student, they showed up, this is what they want to talk about, and then the conversation heads off into this direction? I think I would have two responses to that. First, and I want to make sure I get to both, so the first one would simply be that just because the statute... I think it was this court in Friese v. Formella that said just because the statute begets cases where there's a question about whether conduct falls within the statute doesn't make it a constitutional amendment. But also... We're conflating things. This isn't about whether it's vague. Your argument has started by what's the right standard? So you're saying the right standard is the more favorable-to-use standard because there's no First Amendment issue here. And that's because teachers are working for the state, and the state can control what they do. And I guess what I'm trying to press on is, are there circumstances when teachers end up maybe teaching or inculcating or whatever those other verbs are, but yet they're not engaged in the work, like Bremerton when the guy prays, but here it's just like a student pops up and wants to have a conversation that leads to covered activity. Is that First Amendment activity because it wasn't during class time and the teacher wasn't planning it, but it sort of happened the way I described? Because that gets to what the right standard is, I think. It does. So first of all, while the standard doesn't implicate any First Amendment-protected activity, but does it implicate a substantial amount of activity? I don't think that that interaction would be necessarily a First Amendment problem. Because the reason teachers don't have First Amendment protections in their curricular speech is because it doesn't. offend the First Amendment when the state says, we have these public schools and we are going to control what our students are taught in the public schools, and we're going to hire teachers to teach those things. So I guess I would push back as to how much of your concern about the First Amendment in that context has to do with the concern about whether or not that speech should be allowed, or whether or not it is allowed. Because I do think that we can get to a point if you say that the state cannot control that speech, can that teacher say anything to that student? What if the teacher is saying that the beliefs of the Nazis were a good idea? The state obviously has a right to control that speech, and a vagueness challenge that isn't at its core about the First Amendment. How about Judge Barbador's other point, which is the potential sanction here is so meaningful, loss of license, that under DMIA that triggers the more defendant-friendly or teacher-friendly standard. I don't think it raises the standard above. It has to be vague in all of its applications in order to... Well, it wasn't certainly vague in DMIA and all of its applications. I mean, I certainly think FRIES v. Formella had to do with a criminal statute, right? Which certainly is... And so DMIA's removal, which is not criminal... No, but what I'm saying is in FRIES v. Formella, it was a criminal statute, and still this court said that it had to be vague. To succeed, FRIES must establish that there's no set of circumstances which exist under which the statute would be valid. Well, DMIA's above FRIES in the pecking order, so why does DMIA not support Judge Barbador's view? Because DMIA is a post-enforcement facial vagueness challenge, right? So there's this distinction between pre-enforcement and post-enforcement. When we have post-enforcement, the backstop is you have to prove an as-applied challenge first. But when you have a pre-enforcement challenge, there's no as-applied challenge. There's no person before the court saying the state has violated my due process rights by enforcing this statute. Nobody has had this statute enforced against them. Nobody's due process rights have been violated. And so it's reasonable to say when we're talking about a federal court invalidating a state statute that has never been enforced, that has never been interpreted by the state court, that you need to meet a high standard. You need to prove that there's no set of circumstances under which it could be constitutionally and reasonably enforced before we declare that the state does not have the power to... and violates the Constitution by the mere existence of the statute. I was struck by your answer to one of Judge Afram's questions, that it was a close question and you weren't sure of the answer, regarding a student popping into a teacher's office after class. So I think, it's not that I'm not sure of the answer. The state's position would be that that's definitely covered by the statute. I guess what I intended to say was that me and my opposing counsel would likely disagree on that. But that's an as-applied question, right? For a state court and for the Supreme Court of the state of New Hampshire to decide as to how to interpret the statute. So I think we're at a little bit of a disadvantage here because this is a pre-enforcement facial vagueness challenge that we haven't had the Supreme Court of the state of New Hampshire interpret the statute for. How about a coach gathering players together at half-court of the basketball court? Is comments made there subject to the penalties of the statute? If the coach is teaching those students, instructing those students, or inculcating or compelling them to express a belief in one of the four concepts, then I think that that coach is doing what we hired them to do and therefore the First Amendment is not implicated. They're speaking on behalf of the students. So that's odd because the Supreme Court has said a coach at the end of a game leading prayers is protected by the First Amendment. So I think... Well, I think first it's going to depend on the circumstances, right? It's not... We don't hire teachers to lead or not lead prayer. So I do think that it's different, but again, I want to go back to the point... Well, I want to stay with this point for a minute. So the coach can say a prayer with the players and the statute wouldn't prohibit that? Well, that's not here before the court. What the statute prohibits is not prayer. So the statute doesn't say anything about prayer. It talks about teaching... Well, but we're talking about First Amendment rights. So would this statute prohibit a teacher from leading a prayer at the end of a game at half court or the 50-yard line on the football field? So I think if this court is genuinely concerned about that, it needs to be certified to the New Hampshire Supreme Court. I'm asking you, and I guess if a teacher asked you that question, would they get the no answer that you're giving to me? Well, if a teacher asked me a question, I'd tell them that the state attorney general's office does not provide legal advice to teachers. Well, now I'm getting very concerned then, because I'm a teacher wanting to know if I can lead a plan, and I've read a Supreme Court case that says I can do that, but now I'm being told by New Hampshire, maybe I can, maybe I can't. I'm going to find out, and I could be sued by... The school could be sued by a citizen, and I could lose my job, all because I'd led a prayer. If this court is concerned that there's that much ambiguity in the statute, it needs to go to the New Hampshire Supreme Court. Are you saying it's not ambiguous? If it's not ambiguous, I would think you could give me an answer. A teacher does not violate the statute by leading a prayer. Okay, what if the teacher, instead of leading a prayer, expressed support for one of the propositions that the statute says you should not express support for? For example, express support for affirmative action. If they are teaching or instructing... No, it's exactly the same as leading the prayer, it's just a different prayer. It's a prayer to the virtues of affirmative action. Are you saying some First Amendment rights to lead a prayer survive this statute, but other First Amendment rights in that exact same spot on the 50-yard line would not survive the statute? What I'm saying is when a teacher is teaching, they're not exercising their First Amendment rights. When they're praying, they might be exercising their First Amendment rights, but when they're teaching, they're doing what we hired them to do. You could pray in school at a time that's appropriate, and I think someone could say you're violating the statute. I give a prayer that suggests that Judaism is the best form of religion, that's my prayer. Well, that seems to at least come up against what this is suggesting, that I can't say that one religion is superior to another. It's not that you can't say it, you can't teach it or instruct it or inculcate or compel a student to express... And so in Bremerton, the crowd comes around him, and he knows that, but he's praying, and I just gave a prayer that I think could violate the statute, and he knows the students are around, so now that's potentially, he knows that they're hearing him and that that will have an influence upon them, and so that's potentially a violation of the statute, and it violates his First Amendment rights, it would seem to me. Well, I don't think the question is whether it's potentially a violation of the statute. Given that this is a pre-enforcement facial challenge, there has to be no valid interpretation under which the statute could be held valid, right? I don't think the state contends there's not some interpretation out there under which the statute could be held invalid, but the question before this court in a pre-enforcement facial challenge is whether there's any set of circumstances under which the statute... But this whole argument that we've been having, I think, goes to whether that's right. Isn't that what we're talking about? Because if pre-enforcement attacks a significant amount of First Amendment material, then we don't apply the standard you're telling us. We apply a more favorable standard to them. Yes, correct. But I don't think these hypotheticals we've been talking around around the border are a substantial quantity of First Amendment protected speech. One's age is inherently superior to people of another age. How is a person's age superior to people? Of another age? Well, I guess there's a core of conduct which is covered here. I'm just trying to understand. This is a statute. I'm a teacher trying to understand this, and I see something that says, I can't teach that one's age is inherently superior to people of another age. I don't know what that means. How could age be superior to people? Of a different age, correct? I think if we start with some of the other things besides age, right? Let's say sex. If a teacher in our public schools teaches our students that boys are born better at math than girls, that would violate the first section of it. I'm asking about how I make sense out of this language. That's one of the things we do as a court. We look at language and we try to make sense out of it. So take sex. It says one's sex is inherently superior to people of another sex. Yes. And I think if you taught our students in our public school that boys are born better at math than girls, they're inherently superior at math than girls, that that would violate. It's not saying boys are superior to girls. It's not saying boys' sex is superior to girls. Unless you rewrote the statute to put an apostrophe S and then put sex in there. I guess a boy is better at math than a girl? I'm not sure I understand the distinction you're making. I believe that what the first subsection says is that you can't teach that people in one group are inherently superior to people in another group. You've just rewritten the statute. I'm a teacher. How do I know that you're going to rewrite it that way? I don't think it's rewriting the statute. The statute says age is superior to people. That's what I can't teach. I'm pretty safe here. I'm not going to teach age is superior to people. That would make no sense. It says inherently superior to people of another age. We've got two different groups of people, and we can't teach that one group of them is inherently superior to the other. I'd also point out that the only thing Judge Barbadero-Vallot found vague about that or troublesome about that was the word inherently. He only kind of found that troublesome because he mostly just talks about subsection B and not A. Could I ask you about section 2, the historical example? The historical existence of ideas. Where is the line drawn on that? How do we draw the line on the historic existence of ideas? When teaching about something, say we're teaching about the second sex, that book, that men have oppressed women over time. When does teaching about that turn into teaching about a banned concept? I don't know that it ever does. If you're teaching about the existence of an idea, if you're teaching about people out there in the world who subscribe to an idea, that does not violate the concept, assuming it's part of a larger course of academic instruction, which I just want to make clear is not as complicated as everybody seems to be making it. It means you can teach about Nazis in history and not in math, and you can teach about affirmative action in civics and not biology. Teaching about the fact that there are people out in the world, either in history or now, that believe a certain thing does not violate the concept. You can't just teach affirmative action in social studies and that's a total safe harbor. It depends how it unfolds. Teaching is a very fluid process. Hopefully good teaching is not just standing there and reading to the students your predetermined set of thoughts. It is discussion and engagement and back and forth. Where is that line between we are having a healthy discussion to exhaust the various ideas around the topic versus I have now taught you? In other words, let's say a student makes a comment that would be a banned concept. Have I as the teacher taught it unless I affirmatively say that comment cannot be said? That seems challenging and difficult. You can have a very 1900s view of it, but that's not what we really do. That's only problematic if there's a First Amendment protection such that requiring teachers to steer clear of the concept is a constitutional problem, which it's not in classroom discussions. I would also say that some of the discomfort... They don't want to be fired. They want to do a class that's engaging, enriching, thought-provoking. These are topics I don't think you can dispute with me. Let's just use affirmative action. It's a topic that is current in the news and of interest to people. They want to get students to talk and think about it, but they don't want to be fired. They don't know how to do that because when are they teaching? When are they exposing kids to ideas without teaching? That seems very dicey to figure out. I think your concern finds its heart, however, in your disagreement with the fact that the state of New Hampshire should be telling teachers that maybe they just shouldn't teach about affirmative action. If the statute said that teachers shouldn't express to their students that the Nazi ideas were good, nobody would be concerned about that. Nobody would say, well, teachers don't quite know. They're afraid that if they say some of these things on the edge that they might be read to be saying that Nazism is good. You should steer clear of telling your students that Nazism is good. When we're talking about what the state under the First Amendment can control, when the state hired the speech, we can set the bounds of what is to be taught in our public schools. Whether or not the federal courts believe that the things we've said can and cannot be taught in our public schools... I can look at that. Take a different example from the law. Obscenity was an area where we had all sorts of concerns about vagueness. And then we had Miller v. California. One of the key parts of Miller is not to just leave it up to community standards, but to say a statute must, and then describe in detail, the Supreme Court actually wrote out what a good statute would say, to give notice, and the problem here is, if there is a problem, is that these words are so vague that the notice isn't there. So it's not, don't teach Nazism is good. It's stay away from unknown hot zones that we, the state of New Hampshire, would like you not to teach about. We're not going to tell you really what they are. So you just create a lot of big circles so that the areas you can teach become really small, and the things you can't become really large, because we haven't given you enough direction to know the difference. So I think the statutes do give them enough direction. So the statute, I agree, does not say you can't teach affirmative action, right? But it says that you can't teach that different groups of people should be discriminated against or receive adverse treatment because of their membership in a group. That's clear, and New Hampshire is allowed to write its statutes in a way that will survive over time, right? We don't, every time there's a new sort of topic that comes up, have to write a new statute. Students in the state of New Hampshire should not be taught, when I mandatorily send students to our public schools in New Hampshire, we're not hiring teachers to teach them that people in different groups should be treated differently, or that people in different groups should receive adverse treatment or be discriminated against, or that people in one group are inherently better than people in another group. These are not confusing concepts. You shouldn't teach that those things are the way the world should be, right? You can teach that there have been people in the world, and maybe even are now people in the world, who think differently from those things. Can I teach that sight-impaired people have better hearing because their brains adapt, and that makes them superior because of their disability to someone else? I think you can teach the first half, I don't think you can teach the second half. So the first half is a fact, right? It exists in the world. Assuming it is a fact, I'm not a scientist, but let's assume it's a fact, right? The second one, that they're inherently superior, I think wouldn't be any different than teaching that hearing-impaired people are inherently superior because they can't hear. They have inherently better hearing. Does that trigger the statute or not? Because of the adaptations that their brain makes, let's just assume this is all true, is some kind of scientific process that goes on, they now have superior hearing to the average person who is not sight-impaired. That's not covered. No, because you're not saying they're better, right? You're inherently superior. They have better hearing, just like I have better eyesight than a blind person. These are facts that exist out in the world. Again, I don't want to sound like a broken record, but I want to come back to the question before this court, is whether there's a core of conduct which is clearly covered by the statute, and not whether we can all imagine fringe edges where there might be some question, as this court said in Freeze, that the statute begets cases where there's a question about whether the conduct falls within it or not. There's a core of conduct. New Hampshire teachers can't teach that boys are born better at math than girls. They can't teach that members of the Mormon religion are inherently, by the nature of being Mormon, sexist. They can't teach that naturalized citizens should be entitled to less societal rights or less benefits than natural born ones. They cannot teach that their students should go out into the world and teach and treat people differently based on their sexual orientation. I'm conscious that you're very much over your time. Are there more questions? Okay. Thank you. Thank you, counsel. At this time, would counsel for the Appelees, local 8027, please introduce himself on the record. He has an eight-minute argument. May it please the court. My name is Charles Medler. Together with my colleagues, Harry Sandick and Joshua Goldman, I appear on behalf of the American Federation of Teachers. Mr. Bissonette, on behalf of the ACLU and the National Education Association, and we have agreed to divide the argument given the constraints of time. He will handle the issues of severance, the factual issues that come out of the language of the statute and the certification issue. I will deal with, right now, if I may, the authorization and, indeed, specific instruction of the United States Supreme Court in six cases that the most important issue is enforced in terms of vagueness. I will respond, as well, if I may, to the arguments made by the state, and I will try to address them in the order in which they were presented, because I think that is a good order to do. The first argument that was advanced by the state was that ours is a reasonable interpretation, ours being the state. I learned more about that interpretation today than in taking a dozen depositions from the Commissioner of Education, from the Council to the Commissioner of Education, from the Chief Investigator, from the HRC Commissioner and Deputy Commissioner than I learned in all of those depositions. Why? Because the direct testimony of each of them, each of them, we cannot answer that question directly. Let me give you, if I may, the quotation. This is from Commissioner Edelman and Attorney Fenton in their depositions, and I have the citations, if you would like me to give them to you. They said, we do not have any policies or procedures on what the terms quote, taught, instructed, inculcated, or compelled to express belief in or support for mean. And they would say, we don't have to tell you pre-enforcement. This is going to work itself out, and we will have cases. We will make those decisions when we see real facts. Never got to that point. Never said it. If they had said it, I would have asked them what steps they would take. They stopped there. They refused to answer any further. In fact, they went further. Who would be in a position to answer that question for me? And I quote Commissioner Edelman, well, the teachers would be in the best position to know if they were violating the statute. There must be 10,000 statutes and regulations in this country that are ambiguous. And if you depose the regulator in each of those, you might get similar answers. You wouldn't get the real answer until there was an enforcement action and there was a ruling one way or the other. How do you distinguish this case from the thousands of other cases where we have ambiguous statutes and we have to interpret them in the context of a particular case? I've argued it on both sides, and I will tell you the answer, if I may. You take a deposition. You get sworn testimony. You get testimony like... Not to interpret the statute, we don't. Yes, you do. Because indeed, if you take a good hard look at the citations and the footnotes, in cases like Colander and the like, the court specifically referred to what was said and what the statistics were. That was the basis. So if there's an environmental statute passed regulating carbon dioxide, and I've got a statute here, I depose... You depose who? The legislators? I would agree, Your Honor. That is a different case. And how is it different? The difference here is one that has a distinction. It is a distinction because every single enforcement entity and every single enforcement official made it clear he doesn't know there's a policy. And he referred in every instance, the most we ever got, read the FAQs. The same FAQs that the Attorney General said were confusing and therefore he had to enter into an opinion. Well, then how is that different? Go back to my EPA type example. If I depose EPA officials and they say they don't know, they think about it when they've got a case. I think the answer to that question is if they don't know and they are enforcing it on a basis they don't know, the statute's vague. So that would strike down every ambiguous statute or at least say I could depose the administrators and somebody else in every single ambiguity? No, I don't think it's that broad. I wouldn't make it confined to this case where you have an extremely unusual situation. As Judge Avery pointed out before, every teacher in the state of New Hampshire, bar none, has this clear and direct view, I'd better not get near that subject. Let me give you one example in this record. Stay with that for a minute. Suppose New Hampshire said here's what it is. Yes, this is broad. You can construe it broadly. We advise you to construe it as broadly as you possible can to be on the safe side. If there's no First Amendment implication, then how would that justify a facial challenge to that? I will answer that question again based on their testimony on the stretch. When they were asked those questions, how would you answer? What would you do? The answer from the counsel to the department was I'd hire a lawyer. You can't do that. If government was asked here by both of the labor unions, the NEA and the AFT, as soon as the bill was proposed and deed work was enacted again, would you please meet with us to describe what's going on here? But your premise is that we're not going to wait to see how this plays out in real cases. That's I think the key of the First Amendment part. In the First Amendment context, we don't want to do that because there's a chill and that chill is the First Amendment harm. This, at least arguably part of it, and we had a long discussion about that with the state, is not a First Amendment problem. Is there a problem then in waiting to see how it plays out? So take Johnson, DiMaio, those cases. It took a lot of cases of a lot of litigation to figure out that there's no good way to interpret this thing because real facts were before. Your depositions are like, here's a hypothetical commissioner. Respond. And that's not how the world really works. Because even before the statute became effective, it was already taking its toll. And that's in this record. Look at the affidavit of John Doobie. Here is a teacher who signs a petition. It's affecting teachers, but I'm not saying that's good or bad, but it's affecting teachers. But if the teachers have no First Amendment right, then what are we doing? The issue in this case, under the state's own definition of what triggers it, and I'm in the First Amendment area for a moment, in the state's own definition and the court's definition, if you are a citizen and you are speaking as a citizen, not as a teacher, if you are speaking on a subject of public importance, then you are entitled to ignore cross-setting. But I understand that maybe the statute applies to that, and that's very important. But focus on the teachers in the classroom. Should we have a concern from a constitutional vagueness perspective that this will play out over time because people will complain, the state will have to investigate, it will decline cases, it will go forward on cases. And over a reasonable period of time, you will develop a body of law that will tell us, maybe in a non-vague way, what's covered and what isn't. And if there is, assume for a second there's no First Amendment issue in this statute, what's the concern about that? How many years have to pass before a student is properly taught? Where the chill has barred the teacher from teaching. How many years have to pass? That may be a very bad policy, but is that a constitutional problem? It certainly is, Your Honor, for one reason. Our function as teachers is to give kids a background, a full background, to tell them what the world is like. You've raised a question before, and let me answer it. There's probably not more than a couple hundred people in this world can answer it, for I am a Holocaust survivor. If I went into classes, I do, across this country, and teach, I've been here before. I've seen books burned. I was a kid when I remember it. Am I barred from teaching that in the state of New Hampshire? I am. I've been there before. I don't want to return. I may go back to something less emotional. So suppose the state passed a law that said any teacher who teaches modern math can be fired. It doesn't define modern math. Would you say that the teachers could bring a pre-enforcement facial attack to that, because they'd say, I don't know what modern math means, so I'm going to be deterred from even coming close to anything modern math, and I'm just going to teach arithmetic, which would be bad for the students, bad public policy. But wouldn't the answer to that be the state has a right to dictate the curriculum, and then in an enforcement action, maybe the vagueness would absolve the teacher of any punishment? Your Honor, if the state were explicit, we wouldn't be here. This was drafted, as the legislative history shows, to avoid meeting head-on the question of whether they could teach critical race theory. That was what it was. Christopher Rufo prepared these things for that purpose. And then they were told not to use this language. If they had, we'd be in a very different position. We'd be meeting head-on the question, is that right or is it wrong? I'm not doing that. I'm saying to you, it's vague. Is there a First Amendment aspect to it? Maybe, but I don't think that that's it. But if there isn't, are you entitled to bring a facial upfront challenge? Oh, yes. And what's your authority for saying if there's no First Amendment issue... That issue was directed specifically to Maya and a few other cases by Judge Gorsuch. But those are not pre-enforcement. I mean, I think that's the point, right? The Maya, Johnson, those cases were after years and years played out to try to figure out what to do with the residual clause. And years of experimentation realized there's no answer to this. So finally, in Johnson, they say it's vague. But important to that was the years of playing out because those words on their face are not vague, but they couldn't be applied. That's what those cases are about. Let me say to you the following two things. One, for those years and years of applying, children of New Hampshire are going to suffer. Number two, as the Solicitor General of the United States said to the Supreme Court of the United States within the course of the past ten days, there are some things that have to be addressed now that affect only one man at the moment. This affects every child in the state of New Hampshire. This is the kind of emergency that the Solicitor General should have properly addressed. If I may, two things. I don't want to pontificate. I just want to read the language of two cases, very short, that respond to a statement made by the distinguished counsel of the state. The first, of course, is DeMaio and answers specifically to Ephraim's point. We choose to test and ultimately uphold under the established criteria of the void for vagueness doctrine applicable in criminal cases. That approach was demanded, we explained, in view of the grave nature of deportation, a drastic measure often accounting for lifelong banishment or exile. Here you have an exact case on the record, in this record. John Doobie signed a petition after the bill was signed. The Commissioner of Education was approached by an extremist organization asking how to find John Doobie and all the other signatories. And he gave it to them just willy-nilly. And they were published in the paper. And John Doobie, even the FBI couldn't save him together with the local police. May I make one concluding point? Make it very quick. I was going to read to you Judge Scalia's statement in Johnson. If it's vague, it's vague in all of its aspects. And I thank the court. Thank you, counsel. At this time, would counsel for Mejia et al. please introduce himself on the record to begin. Thank you, Your Honor. I'm pleased to forward you with the statement on behalf of the plaintiffs, Enya New Hampshire, Christina Kim-Phillibot, and Andres Mejia. First, I do want to start just with the standard. And I want to just break out the standard into two prongs, because I think there is a difference. The first is, what is the facial vagueness standard in this case, number one? And number two, is there heightened scrutiny applied to that standard? So I think it's very important to kind of break up the analysis in that way. As to the first question, just what is the standard, I do think it's very clear when you look at the Supreme Court's decision in Johnson, Davis, and DiMaia, that the all of its application standard that the state is advancing just isn't the standard here. And that, it's not the standard here, whether we raise First Amendment claims or not. And I think DiMaia establishes that quite clearly. A case where there was not a First Amendment claim there, albeit very significant liberty interests, not a First Amendment claim raised, yet the court there rejected the notion that the all of its application standard. But did you have a pre-enforcement? Yes, and I, no, not in DiMaia. Can you point to an instance where it's a pre-enforcement challenge without a First Amendment implication? I think we'd have to, I haven't done that research necessarily. What I will tell you, though, is that I think certainly the Lakewood case establishes quite clearly. But when you say you haven't done the research, this has been an argument that the state has advanced all along in the case. And you're saying you didn't research it? No, I'm sorry. Well, I have researched it. Okay, and there's no case? Well, I think the case that I would rely heavily for that proposition, Your Honor, and I apologize, would be the DiMaia case. True, not a pre-enforcement challenge. But a case in which the facial vagueness standard was applied. There was... But can't you see there how the court was in so much of a better position to say, yes, this is vague? Trying for years to come up with a way to make it work. And they finally could not come up with a way to make it work. And the difference here is, which might be a real difference, no effort's been made to make it work. I mean, we absolutely have no idea how narrowly or broadly this thing is going to be applied. Well, I think I would push back against that, Your Honor. Obviously the state is arguing here that this is a pre-enforcement challenge. We haven't seen any enforcement in this case. And I think the record strongly rebutts that. And I would also note, I think this is in fact one of the reasons why Judge Barbadaro asked the parties to develop a record. In order to take this case outside the realm of a law school exam problem, which it is not, and bring this case back into the real world realities that educators are faced in the classroom trying to confront this law and how to apply it. This case is far more than the four corners of a teaching introductory clause and the four corners of the concept. So this court, of course, must start with the text first. But it's about how educators have to apply books with words, with ideas, to the four corners of that statute. And so what Judge Barbadaro asked us to do was, and I know there's a question of the relevance here, but I think it is very relevant, to ask questions about enforcement to the very enforcers of the statute. And what we have learned through the course of this case is, in fact, the Department of Education basically engaged their superintendents when complaints were made under this law. The Department of Education even had communications with parents who made complaints under this law. And I would go even one step further, that there's been a complaint docketed at the Human Rights Commission under this very law. So I think the problem here with just evaluating this in individual cases is that the underlying fear and harm, whether or not First Amendment interests are implicated here, is that there is inherent chill in the classroom, including curricular speech, regardless of whether it's pertinent. And again, this may be bad public policy. But what if the New Hampshire says, we want there to be chill. I mean, I think that's what I heard the State say. We want there to be chill in the classroom. That may be bad, a bad idea. But what makes that illegal? It's very unconstitutional. It's unconstitutional here, because independent of the First Amendment, we have not just a vague regulation that may be trying to create chill, which I think it is. We have a vague regulation trying to create chill and attaching penalties to it. And that's what Judge Barbador concluded on page 19 of his summary judgment decision. So what do you say about my hypothetical question? They pass a statute that says, don't teach modern math and don't dare come close to it. So be chilled. I mean, whether you think that's good policy or not, couldn't the State do that as long as there weren't First Amendment applications outside the classroom? No, I don't think the State could do it. If it attached to the statute, as the State did here, that a violation of that provision, that undefined provision, would constitute a violation of the code of conduct. So when you attach a penalty, then you make problematic the example I gave, because someone could not know they were violating it and yet be punished. But you've got to take it to another step, which is to say, in that scenario, the application of the penalties means there can be a pre-enforcement challenge. And that leads us back to, you've got no case law whatsoever supporting that. I think, I would just pivot back to, as the District Court did, to the DiMaia case. There wasn't a lot of discussion, frankly, about this at the District Court, because I think there was certainly an assumption on our side that DiMaia provided the very form of relief, the structure of relief that we're seeking in that case. But that's post-enforcement. Yes, it was. But with respect to, I think the key aspect of DiMaia, certainly that plaintiffs have been relying on throughout the case, is the articulation of the standard to bring a facial vagueness claim. And that is precisely the standard that we argued should be applied to the District Court, precisely the standard that the District Court applied here. Not the all-of-its-applications standard, but the analysis that we are all familiar with, which is whether or not the language in the statute, element one, or factor one, that the law fails to give the person of ordinary intelligence the opportunity to know what is prohibited so they can act accordingly. Number one, we think we've established that. And even if the Court disagrees, if we can separately and independently show that the law allows for arbitrary and discriminatory enforcement, we also prevail. We have built a record. This law was in effect for three years. We have built a record showing that show, showing possible and probable applications. These are not hypotheticals. We have real books that were relied upon by the enforcers of this law to justify. But what do you do? See, part of the problem here is the conduct that's being chilled, if we put to one side the extracurricular activity, is conduct that the State could prohibit. So how do you factor that into saying that because it's chilled, we've got to do a pre-enforcement mechanism? Suppose the State took a step further and said, all right, you're worried about us chilling, you're doing it, here's a new law, don't do it. I think it's for, I think it's a chill, even if we were to set aside the First Amendment implications, and I don't think the Court should, even if we were to set aside, I think, again, the justification was, and I can only reiterate the argument I made before, Your Honor, is that, albeit in a pre-enforcement challenge, we have the standard set forth in DiMaio where you have a penalty with severe consequences. Baked within that are ambiguous circumstances with respect to the liberty interest at stake and when that liberty would be charged. I do think that is exactly this case, and I do, I just want to emphasize before it, we have a statement of facts that's quite extensive. The District Court wanted this Court to have that record of enforcement that we've seen both by the DOE and by the Human Rights Commission, as well as the real chill that educators have been confronting. Mr. Bissonnette, why don't you talk for a minute about what the First Amendment, potential First Amendment aspects of this statute are? Sure, and I would just note that those are arguments that have been raised by AFT, but I can't speak to those, just albeit very briefly. I think this Court's decision in Bruce is very instructive, and obviously Kennedy versus Bremerton is very instructive here. And I think, of course, what this Court must do is look at the nature of the speech itself, even if the educator is in the four corners of a classroom, right, or if that educator is doing something else in a school capacity but engaging in speech that would be in an individual capacity. I think we're in agreement with the State that you have to look at the nature, right, of the speech itself as to whether or not it's official or individual capacity speech. I just do want to highlight here that we're not dealing with a sliver of protected activity. We're dealing with a huge scope of protected activity. One can envision a million, well, I don't want to be hyperbolic, a significant number of applications, right? You can imagine not just, of course, a football coach maybe having a prayer on the sidelines, but a football coach having a thousand conversations with students during bus trips, during away games about things, about college admissions, and maybe in the context of a college admission discussion, perhaps there's a discussion. Right, so that's, I guess, what I'm trying to figure out. So Bremerton is about something really personal to Mr. Bremerton, right? He wants to offer his own prayer that's meaningful to him, and the Supreme Court has said that's his own speech. This bus idea is something I guess I would just want to probe for a second. So you're on, your teacher's on the bus, kids are chatting up the teacher, I know this happens, they're talking about all manner of things. It's not sort of personal to the teacher in the way the Bremerton prayer is. He's just doing what I think good teachers do. They become role models and important figures in young people's lives, and they talk to them, and they explain things to them, and they hear things, and they comment on them. And is that within the teacher's role? Is that like Bremerton, or is that not really different from what I do in the classroom when things come up and I respond to them? Well, I think it is like Bremerton. And I want to be very clear that a teacher can kind of be wearing their teacher hat in the classroom, or wearing their coach hat on the football field or on a bus, but even while wearing that hat, engage in speech that falls outside those official duties. And that is the speech that we're concerned about, right? Where if that speech is of public interest, if that speech is in an individual capacity, and many of those interactions will be, then that teacher falls right within the target of this particular law. And we know this as well, because the FAQs and the guidance documents acknowledge the extracurricular, outside-the-school implications of this law. So I think the Bruce case from this court, 34F4-129, lists the factors in assessing whether or not speech is official capacity or private capacity speech, and in reviewing those, I think it does become clear that there could be an infinite number of ramifications for educators. I do know my time is up. I do just want to make a couple more points, and I apologize to my counsel to my left, but I do want to push back strongly against the notion that the law doesn't ban simply stating the existence of these concepts. I just don't think that's right at all. You look at this Supreme Court's decision in Keshien, and this court's decision in Osanoff, dealing with the phraseology of the term advocacy, I think what we're dealing with here are really ambiguous statutes where no one really knows, certainly an educator doesn't know, if I just assign a topic, if I have students play devil's advocate, if I even have students engage in the Socratic method, are they covered? I would note at the district court, there was, I believe, an indication by the government that the Socratic method is covered by this. That's hardly an affirmative act of teaching. Yet, if that's covered, I mean, how are educators really supposed to know? And I only say this to articulate the breadth and scope. It is not as simple as saying, well, teaching is covered, but articulating the existence is not. There are lines engrained, baked within all of that, and our teachers have to evaluate in the moment what that line is, and they've received absolutely no guidance. I'm conscious of your time. Can you tie this up, please? Thank you. I just wanted to say certification is inappropriate. It's not before this court. The Baguette case articulates, I think, why that's inappropriate. So I just wanted to highlight the certification issue, and that's because this law is susceptible to an infinite number of applications, and that, again, was raised before the district court, and the court didn't advance that argument. With that, I just wanted to say one last thing that I just think, for candor, the court needs to know. There are efforts at the legislature to potentially amend this statute. I don't think it has any bearing on what this court should do, because we don't know what the legislature will ultimately do. And, in fact, I think our preference would be, if anything, for this court to act quickly to provide guidance. Thank you, Your Honor. Thank you, Counsel. At this time, Counsel for the Appellant, please reintroduce yourself on the record. You have a two-minute rebuttal. Mary Trick on behalf of the State Defendants. I have just three quick points that I'd like to make that I didn't get to the first time. The first is, all of the First Amendment discussion here has been related to RSA 19340. We have a whole other statutory provision, RSA 354, which only speaks to the activities of public employers, what public employers can and cannot do. And so, when we're talking about a particular employee's speech, it can go one of two ways. Either the employee is speaking pursuant to their official duties, in which case there's a reasonable probability that it would be attributable to the employer and covered by the statute, but certainly not covered by the First Amendment. Or the employee can be speaking as a citizen on a matter of public concern, in which case certainly the First Amendment would apply, but the statute would not, because it would not be attributable to the employer. So any First Amendment concerns that this Court has are confined to RSA 19340 and not RSA 354A 31 and 32. That leads me to my second point, which is about severability. If the plaintiffs succeed in showing any vagueness here, this Court below still erred by invalidating all of both statutory provisions. There are two provisions, there are four enumerated concepts, and there are a handful of verbs in each of the provisions. Statutes in New Hampshire are presumed severable, and the chapter law that enacted these provisions has a specific severability provision within it where the legislature made clear that they should be treated as severable. And so to the extent there is any vagueness, it needs to be severed from the remainder of the statute. And then my final point is that if this Court believes that the statute is subject to interpretations that implicate a substantial amount of First Amendment speech, then it needs to ask the New Hampshire Supreme Court if that's the interpretation it would take. Because the New Hampshire Supreme Court narrowly construes things to avoid constitutional problems. And so before this Court declares that the state can't enforce the law, they need to know how the state would enforce the law. Thank you. Thank you, counsel. That concludes argument in this case.